UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| TIMOTHY N. HATTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:20-cv-02609-SEB-MPB |
| | ) | |
| ERICK FALCONER, | ) | |
| DIANNA JOHNSON, | ) | |
| SHELLY JACOBS, | ) | |
| JUDY K. SWAIN, | ) | |
| KARISSA SMITH, | ) | |
| LORRI DELK, | ) | |
| | ) | |
| Defendants. | ) | |

**Order Granting Defendants' Motions For Summary Judgment**

Timothy Hatton is an inmate at New Castle Correctional Facility. He brought this lawsuit alleging that several health officials and his case manager acted with deliberate indifference when treating his broken hand and injured elbow. Defendants have all moved for summary judgment. Although there were delays in treating Mr. Hatton's hand, the record before the Court demonstrates that no Defendant was deliberately indifferent. Accordingly, Defendants' motions for summary judgment, dkts. [79] and [83], are **granted** and final judgment shall be entered.

I.
**Standard of Review**

Parties in a civil dispute may move for summary judgment, which is a way of resolving a case short of a trial. *See* Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is no genuine dispute as to any of the material facts, and the moving party is entitled to judgment as a matter of law. *Id.*; *Pack v. Middlebury Comm. Sch.*, 990 F.3d 1013, 1017 (7th Cir. 2021). A "genuine dispute" exists when a reasonable factfinder could return a verdict for the nonmoving

1

party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that might affect the outcome of the suit. *Id.*

When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572-73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court is only required to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it is not required to "scour every inch of the record" for evidence that is potentially relevant. *Grant v. Tr. of Ind. Univ.*, 870 F.3d 562, 573-74 (7th Cir. 2017).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325.

## II.
## Factual Background

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence "in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). Mr. Hatton's Second Amended Complaint, dkt. 11, is signed under the penalties of perjury, and so the Court treats statements made based on personal knowledge as evidence when

2

reciting and applying the facts in this case. *See Jones v. Van Lanen*, 27 F.4th 1280, 1285 – 86 (7th Cir. 2022) ("[T]he law allows verified complaints—containing not just allegations but sworn statements of fact—to serve as evidence for purposes of summary judgment.").

This case concerns the treatment of Mr. Hatton's hand. On July 20, 2020, he fractured his hand. Dkt. 11 at 2.[1] Shortly after the fracture, Mr. Hatton was escorted to the prison medical unit. *Id.* at 42; Dkt. 85-2, ¶ 4.

Mr. Hatton was seen by Nurse Eric Engle in the prison medical unit. Dkt. 85-2, ¶ 4. Nurse Engle's notes reflect that Mr. Hatton was not injured and that he refused medical treatment:

> [Offender] was brought to outpatient after an altercation in f-unit. [Offender] was not injured and stated he had no complaints. He denies SI/HI. Offender refused vital signs at this time. No signs of acute distress noted during evaluation. [Offender] was returned to the unit.

Dkt. 81-5, Nurse Visit, July 20, 2020. Mr. Hatton denies that he refused medical treatment. Dkt. 85-6 at 42. He also states that staff took pictures of his hand, but no medical treatment was provided. Dkt. 11 at 2.

Mr. Hatton states he submitted healthcare requests once or twice per month after seeing Nurse Engle. Dkt. 85-6 at 43. He talked to nurses and showed them his hand when they brought him his medicine; one of these nurses was Nurse Marisa Terry. *Id.* at 45. Mr. Hatton also testified that he "tried contacting" Judy Swain, a medical assistant, in September 2020 but did not actually speak with her until October. *Id.* at 49.

Mr. Hatton submitted a healthcare request on September 28, 2020, complaining that his hand was still broken. Dkt. 98-1 at 2. Mr. Hatton was then seen on October 7, 2020 by Nurse Terry.

---

[1] The parties dispute whether Mr. Hatton sustained the fracture by striking another inmate or by slipping and hitting his hand while brushing his teeth. *Compare* dkt. 85-2, ¶¶ 4, 9, *with* dkt. 85-6 at 41. But the cause of the fracture is immaterial to the question of whether the defendants were deliberately indifferent to Mr. Hatton's condition.

Dkt. 85-2 ¶ 5. Nurse Terry observed an abnormality to one of Mr. Hatton's metacarpals (knuckles), but she did not observe any bruising or swelling. Dkt. 85-7, Mr. Hatton's Medical Records at 13 – 14. Nurse Terry referred Mr. Hatton to be seen by a medical provider. *Id.*; *see also* Dkt. 85-1, Affidavit of Nurse Practitioner Dianna Johnson ¶ 6.

At some point in October, Mr. Hatton was transferred into C-Dorm. *See* Dkt. 85-6 at 69. He had a conversation in the hallway with Case Manager Karissa Smith, and he requested a bottom bunk pass because he was having pain climbing into the top bunk. *See* Dkt. 85-6 at 78. Case Manager Smith attested that Mr. Hatton was never assigned to her unit nor was he assigned to her case load. Dkt. 81-1 at ¶ 13. The majority of bed moves come from Unit Team Managers, not Case Managers. *Id.* ¶¶ 7, 13.

Mr. Hatton was scheduled to see a medical provider on October 13, 2020, but the visit was rescheduled due to a conflict. *Id.* ¶ 7. Ms. Swain, who was responsible for assisting physicians with scheduling, cancelled the appointment. Dkt. 85-7 at 12; *see also* Dkt. 85-3, Affidavit of Judy Swain at ¶ 8.

Mr. Hatton was seen at sick call on October 14, 2020 with Nurse Lara Conway. Dkt. 85-7 at 10. He refused to have his vitals measured and it was noted that he was scheduled to see the physician. Dkt. 85-3 at ¶ 9.

Mr. Hatton was eventually seen by Nurse Practitioner Dianna Johnson on November 6, 2020. *Id.* ¶ 8. Nurse Practitioner Johnson's notes reflect that Mr. Hatton told her he had gotten into a fight four months prior and that he was having pain in his elbow and hand. Dkt. 85-7 at 6 – 9; Dkt. 85-1 at ¶ 8. Nurse Practitioner Johnson observed that Mr. Hatton had free range of motion in the elbow but noted that his right hand had some swelling. *Id.* She ordered an x-ray of his elbow and hand. *Id.* She also prescribed him Tylenol. *Id.*

4

Mr. Hatton's received the x-ray on his elbow and hand on November 10, 2022. Dkt. 85-1 at ¶ 9; Dkt. 85-7 at 17. The results were interpreted by Dr. Daniel Altman. *Id.* Dr. Altman noted that there was no abnormality of the right elbow. *Id.* He also noted there was "an old healed fourth metacarpal neck fracture with mild residual dorsal apex angulation and slight foreshortening." *Id.* Dr. Altman did not observe any acute fractures or dislocations. *Id.* Nurse Practitioner Johnson does not recall when she received the X-ray results; but she stated the x-ray results did not mandate any acute or urgent medical treatment as the report indicated an old, healed fracture. Dkt. 85-1 at ¶ 10.

Also in November, Mr. Hatton discussed seeing a medical provider with Shelly Jacobs, an administrative assistant at New Castle, but she refused to schedule him. Dkt. 85-6 at 47. Mr. Hatton also testified that he had a face-to-face interaction with Dr. Erick Falconer, the medical director at New Castle. Dkt. 85-6 at 65. Dr. Falconer states that it is possible he may have seen Mr. Hatton at some point in passing, but at no point did he perform a clinical assessment of Mr. Hatton in November of 2020. Dkt. 85-2 at ¶ 7. There are no medical records indicating an assessment occurred. Dkt. 85-6 at 66.

Mr. Hatton's dispensary records reflect that Tylenol was dispensed in both November and in December. *See* Dkt. 85-8 at 2 (noting Tylenol was dispensed on November 12, 2020 and December 4, 2020); *see also* Dkt. 85-5, Affidavit of Lorri Delk at ¶ 9 ("[I] dispensed to Mr. Hatton his 30-day supply of Tylenol 500 mg in both November and December 2020[.]"). Mr. Hatton, however, contends Lorri Delk, a nursing assistant who was responsible for dispensing medication, failed to dispense his Tylenol on December 9, 2020, and "harassed" him and told him she would withhold his medication. Dkt. 11 at 4 – 5. Mr. Hatton ultimately received the medication. Dkt. 11 at 5.

Mr. Hatton submitted a series of healthcare requests concerning his Tylenol prescription during the next several months. He requested a refill on December 20, 2020, and the response noted that his next "refill" would occur on January 5, 2021. Dkt. 98-1 at 8. It is not clear who responded to this request. *Id.* Mr. Hatton next submitted a refill request on January 8, 2021, and the response on March 9, 2021, noted that there was no active order, and that the medical provider had been notified. *Id.* at 9. Again, it is not clear who responded to this request. On January 16, 2021, Mr. Hatton submitted a healthcare request again seeking a refill of his Tylenol prescription, and Ms. Delk responded that he had no active order, and that he was directed to purchase anti-inflammatory medication off the commissary. *Id.* at 10. On February 18, 2021, Mr. Hatton submitted a fourth request for a refill of Tylenol. *Id.* at 11. The response indicates that Tylenol was ordered on April 7, 2021. *Id.* Mr. Hatton complained on May 8, 2021, that Tylenol was ineffective, and so he was scheduled to see the provider. *Id.*

Nurse Practitioner Johnson again saw Mr. Hatton on May 26, 2021. Dkt. 85-1 at ¶ 12. Mr. Hatton complained again of pain in his elbow and hand; Nurse Practitioner Johnson did not believe it required a referral offsite or any surgical intervention. *Id.* She prescribed him prednisone and continued his order of Tylenol to help his pain. *Id.* Aside from this visit and the one in November 2020, Nurse Practitioner Johnson did not see or otherwise treat Mr. Hatton. *Id.* ¶ 14.

Mr. Hatton filed the present lawsuit on October 6, 2020. Dkt. 1. His second amended complaint, which is the operative pleading in this action, names six defendants: Dr. Falconer, Nurse Practitioner Johnson, Shelly Jacobs, Judy Swain, Lorri Delk, and Case Manager Karissa Smith. Dkt. 11. Mr. Hatton contends Dr. Falconer and Nurse Practitioner Johnson were deliberately indifferent in failing to provide medical treatment to his fractured hand. He contends Nurse Delk denied him medication in December 2020. He alleges Nurse Jacobs and Nurse Swain

denied scheduling him with the medical providers. And he contends Case Manager Smith was deliberately indifferent for refusing to issue a bottom bunk pass.

### III.
### Discussion

The Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on the states, through the Fourteenth Amendment, "to provide adequate medical care to incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials can be liable for violating the Eighth Amendment when they display deliberate indifference towards an objectively serious medical need." *Thomas v. Blackard*, 2 F.4th 716, 721–22 (7th Cir. 2021). "Thus, to prevail on a deliberate indifference claim, a plaintiff must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)).

For purposes of this motion, the Court assumes that the injuries Mr. Hatton sustained to his hand and elbow are a serious medical need. To survive summary judgment then, Mr. Hatton must show that Defendants acted with deliberate indifference—that is, that they consciously disregarded a serious risk to his health. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016).

Deliberate indifference requires more than negligence or even objective recklessness. *Id*. Plaintiff "must provide evidence that an official actually knew of and disregarded a substantial risk of harm." *Id*. "Of course, medical professionals rarely admit that they deliberately opted against the best course of treatment. So in many cases, deliberate indifference must be inferred from the propriety of their actions." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021) (internal citations omitted). The Seventh Circuit has "held that a jury can infer deliberate

7

indifference when a treatment decision is 'so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment.'" *Id.* (quoting *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006). But where the evidence shows that a decision was based on medical judgment, a jury may not find deliberate indifference, even if other professionals would have handled the situation differently. *Id.* at 241-42.

A.   **Personal Involvement**

Before turning to whether Defendants were deliberately indifferent, the Court begins with a threshold issue in this case: personal involvement. To be held liable under § 1983, an official must be personally involved in any underlying deprivation. *Johnson v. Rimmer*, 936 F.3d 695, 710 (7th Cir. 2019) ("In an action under § 1983, the plaintiff must establish individual liability . . . [the plaintiff] must be able to establish [the defendant's] personal involvement in the alleged constitutional deprivation."); *Williams v. Shah*, 927 F.3d 476, 482 (7th Cir. 2019) (individual defendants cannot be held liable under § 1983 unless they had some personal involvement in the alleged deprivation). This applies in prisoner medical care cases. *See e.g. Estate of Perry v. Wenzel*, 872 F.3d 439, 459 (7th Cir. 2017) (granting summary judgment to defendants where there was insufficient evidence they were involved in denying the plaintiff medical care).

This principle is important for two reasons. First, Mr. Hatton submits that he is "not required to show direct, literal contact with the defendants to prove deliberate indifference." Dkt. 98 ¶ 3. He also suggests defendants can be held collectively liable. *See also* Dkt. 93 ¶ 1 ("Plaintiff contacted the Defendants, both collectively and individually, about this serious injury many times starting July 20th, 2020[.]"). But this misstates the standard. The Seventh Circuit has rejected similar theories:

> [Plaintiff] contends in this suit under 42 U.S.C. § 1983 that seven persons, starting with the Secretary of the Wisconsin Department of Corrections and working down

>through its organization chart, are liable because they exhibited deliberate indifference to his serious medical need. The assumption underlying this choice of defendants—that anyone who knew or should have known of his eye condition, and everyone higher up the bureaucratic chain, must be liable—is a bad one. Section 1983 does not establish a system of vicarious responsibility. Liability depends on each defendant's knowledge and actions, not on the knowledge or actions of persons they supervise.

*Burks v. Raemisch*, 555 F.3d 592, 593 – 94 (7th Cir. 2009). Instead, Mr. Hatton must have evidence that each Defendant was involved in his care, and each Defendant can only be liable for his or her own conduct—not for the conduct of others.

Second, the principle of personal involvement is important in this case because none of the Medical Defendants became involved with Mr. Hatton's care until Nurse Swain scheduled him to see Nurse Practitioner Johnson on October 13, 2020. *See* Dkt. 85-7 at 12. Before that, only non-parties were involved with Mr. Hatton's care. *See* dkt. 81-5 (visit with Nurse Engle on July 20, 2020); dkt. 98-1 at 2 (healthcare request response from Lara Conway); dkt. 85-2, ¶ 5 (visit with Nurse Terry[2] on October 7, 2020). Throughout his briefing, Mr. Hatton asserts "Defendants" knew of his injury in July 2020, but there is no evidence supporting these assertions. Indeed, no reasonable jury could find that any Defendant was personally involved in his care in July 2020.

In light of these principles, the Court now considers whether a reasonable jury could find that any Defendant was deliberately indifferent to Mr. Hatton's condition.

### B.     Nurse Practitioner Johnson

Nurse Practitioner Johnson is entitled to summary judgment because no rational jury could find she was deliberately indifferent to Mr. Hatton's medical needs. She only saw Mr. Hatton twice. Dkt. 85-1 at ¶ 14. The first time, on November 6, 2020, she ordered an x-ray of his elbow and

---

[2] Mr. Hatton disputes much of what Nurse Terry states in her note from the October 7th visit. Dkt. 88 at 2 (arguing Nurse Terry told him if they had treated the fracture much sooner, then the bone would have likely been reset); *id.* (contesting whether he told Nurse Terry the cause of his injuries). But Nurse Terry is not a party to this case, and so Defendants cannot be held liable for her conduct.

hand, and she prescribed him Tylenol. *Id.* at ¶ 8. The second time, on May 26, 2021, she prescribed him prednisone, continued his order of Tylenol to help his pain, and directed him to purchase anti-inflammatory medication off the commissary. *Id.* ¶ 12. She does not believe Mr. Hatton required any off-site treatment, surgical intervention, or additional treatment, particularly because his fractured hand had healed by the time she saw him on November 6, 2020. *Id.* ¶¶ 12, 14. Mr. Hatton has not shown Nurse Practitioner Johnson's care was outside the "range of acceptable courses based on prevailing standards in the field[.]" *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 965 (7th Cir. 2019). No reasonable jury could therefore find she was deliberately indifferent.

Mr. Hatton's contrary arguments are unpersuasive. First, he contends the care provided by Nurse Practitioner Johnson amounted to deliberate indifference because his ring finger "now dangles over [three] inches from where it should be" and that "his knuckle is displaced by about an inch." Dkt. 93 at 3. He disagrees that "surgical intervention is not necessary," and he continues to have pain associated with his hand. *Id.* at 4. For reasons already explained, however, it is undisputed the x-ray showed that the fracture had healed by the time Nurse Practitioner Johnson treated Mr. Hatton, and he has not shown that her treatment "radically" departed from professional standards. *Walker*, 940 F.3d at 965; *see also Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) ("A medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under the circumstances.") (internal quotations and citation omitted).

Mr. Hatton also argues Nurse Practitioner Johnson is responsible for the delay in his treatment. It is true that delays in treatment can sometimes amount to deliberate indifference, *see e.g. Perez v. Fenoglio*, 792 F.3d 768, 777 – 78 (7th Cir. 2015), and his first appointment with Nurse Practitioner Johnson was cancelled, which resulted in a three-and-a-half-week delay.

10

However, Nurse Practitioner Johnson is not directly involved in the process for scheduling appointments. Dkt. 85-1 at ¶ 1. And even if the delay can be attributed to Nurse Practitioner Johnson, this was at most negligence because it was postponed due to a scheduling conflict; there is no evidence she recklessly ignored his requests. *Olson v. Morgan*, 750 F.3d 708, 713 (7th Cir. 2014) (negligence does not amount to deliberate indifference). Additionally, there is no evidence that *this* delay contributed to his injuries. *See Langston v. Peters*, 100 F.3d 1235, 1241 (7th Cir. 1996) ("[A]n inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed.") (internal quotations and citation omitted), *cited with approval in Gabb v. Wexford Health Sources, Inc.*, 945 F.3d 1027, 1034 (7th Cir. 2019).

Mr. Hatton finally argues that Nurse Practitioner Johnson has been deliberately indifferent to his pain. But she prescribed him Tylenol, and when it proved ineffective, she prescribed him prednisone in May 2021 and directed him to purchase an anti-inflammatory from the commissary. *Id.* ¶ 12. Although his prescription lapsed for three months, the Court cannot say this amounted to deliberate indifference considering the x-ray in November 2020 revealed an old, healed fracture with no acute injury. *Id.* ¶ 12. While Mr. Hatton insists more should have done, prisoners are "not entitled to demand specific care[.]" *Walker*, 940 F.3d at 965 (internal quotation and citation omitted). Accordingly, Defendants' motion for summary judgment with respect to Nurse Practitioner Johnson is **granted**.

    **C.**    **Dr. Falconer**

Summary judgment is likewise appropriate for Dr. Falconer because there is no evidence that he was involved in Mr. Hatton's treatment. *Johnson*, 936 F.3d at 710. Dr. Falconer was the medical director at New Castle, and while he saw and treated inmates, there is no evidence he saw

and treated Mr. Hatton. Dkt. 85-2 at ¶ 7. Mr. Hatton contends he had a "face-to-face" with Dr. Falconer in November 2020, after he received his x-ray, but there are no medical records to support this contention, and there is no evidence that any clinical assessment was done. *Id.* This assertion is insufficient to show Dr. Falconer was responsible for treating him.

But even if Dr. Falconer was personally involved, there is no evidence he was deliberately indifferent. By the time Mr. Hatton had this "face-to-face" meeting with Dr. Falconer in November 2020, Mr. Hatton's x-ray reflected that fractured had already healed, Dkt. 85-7 at 17, and he had already received treatment from Nurse Practitioner Johnson. Dkt. 85-1 at ¶ 8. In Dr. Falconer's opinion, Mr. Hatton did not require any off-site care, surgical intervention, or any additional care beyond what Nurse Practitioner Johnson had provided. Dkt. 85-2 ¶ 10. Again, Mr. Hatton disagrees with the care provided, but he is not "entitled to demand specific care," and there is no evidence that the treatment provided was outside the bounds of medical professionalism. *Walker*, 940 F.3d at 965. Defendants' motion for summary judgment with respect to Dr. Falconer is **granted**.

D. Judy Swain

Summary judgment is likewise appropriate for Judy Swain. She was a medical assistant who assisted the physicians and nursing staff. Dkt. 85-3 at ¶ 2. She does not have a medical or nursing license, and she cannot provide medical treatment. *Id.* Her only involvement in Mr. Hatton's care was cancelling his first appointment with Nurse Practitioner Johnson because of a scheduling conflict. Dkt. 85-7 at 12. Assuming Ms. Swain was responsible for the cancelled appointment and the ensuing delay, this was at most negligence and there is no evidence that the

delay contributed to his injuries. Accordingly, Defendants' motion for summary judgment as to Judy Swain is **granted**.[3]

### E. Shelly Jacobs

Shelly Jacobs is likewise entitled to summary judgment because there is no evidence she was deliberately indifferent to his medical needs. Like Ms. Swain, Ms. Jacobs was an administrative assistant at New Castle, and she was responsible for assisting the physicians and nursing staff. Dkt. 85-4, Affidavit of Shelly Jacobs at ¶ 2. She does not have a medical or nursing license, and she cannot provide direct patient care. *Id.* at ¶ 3. Ms. Jacobs does not recall having any interaction with Mr. Hatton regarding the treatment of his hand. *Id.* ¶ 4. The only record evidence of her involvement is that she scheduled Mr. Hatton's x-ray after Nurse Practitioner Johnson ordered it. Dkt. 85-7 at 5. Given her involvement, no rational jury could find she consciously disregarded a risk of serious harm to Mr. Hatton's hand. *Petties*, 836 F.3d at 728.

Mr. Hatton argues he requested Ms. Jacobs schedule him with the physician, but that she refused his request. Dkt. 85-6 at 47. He also submits that she was responsible for denying his healthcare requests. *Id.* at 27. But he admitted that this conversation with Ms. Jacobs occurred in November. *Id.* at 47 ("Q: With Ms. Jacobs can you recall any face-to-face conversations with her about your right hand or right elbow during July, August, or September 2020? A: No, not until, I believe it was November."). By this time, Mr. Hatton had already seen Nurse Practitioner Johnson and was receiving treatment. And with respect to the healthcare requests, Mr. Hatton does not specifically identify which ones she responded to or what he requested and what Ms. Jacobs denied. *See id.* at 27. In any event, Ms. Jacobs cannot provide medical care, and so she was entitled

---

[3] Mr. Hatton also asserts he "tried contacting" Judy Swain in September, dkt. 85-6 at 49, but this is insufficient to show she knew of and was deliberately indifferent to a serious risk of harm. *Crouch v. Brown*, 27 F.4th 1315, 1322 (7th Cir. 2022).

to rely on Nurse Practitioner Johnson's prescribed course of treatment. *Rasho v. Elyea*, 856 F.3d 469, 478 (7th Cir. 2017) ("Prison officials generally are entitled to rely on the judgment of medical professionals treating an inmate."). Summary judgment is therefore appropriate on Mr. Hatton's claims against Ms. Jacobs.

    **F.    Lorri Delk**

Summary judgement is equally appropriate for Lorri Delk. She was a nursing assistant whose primary responsibility was to dispense medications to offenders in accordance with the orders of the medical providers. Dkt. 85-5 at ¶ 6. Mr. Hatton contends she was deliberately indifferent on two separate occasions: first, she did not properly dispense his Tylenol on December 9, 2020 and "harassed" him about his medications; and second, she improperly denied his healthcare request in February 2021 to dispense Tylenol. But Mr. Hatton's dispensing records demonstrate that Ms. Delk delivered Tylenol to him on December 9, 2020. Dkt. 85-8 at 2; *see also* Dkt. 85-5 at ¶ 9. And with respect to the healthcare request denial, dkt. 85-9, Mr. Hatton did not have an active prescription for Tylenol on January 26, 2021, dkt. 85-5 at ¶ 10, and Ms. Delk does not have the authority to order medications or to continue a medication ordered by a medical provider. *Id.* ¶ 14. Since Mr. Hatton's order for Tylenol expired on January 4, 2021, dkt. 85-5 ¶ 10, her denial of his healthcare request did not amount to deliberate indifference. Neither scenario demonstrates Ms. Delk was deliberately indifferent, and so she too is entitled to summary judgment.

    **G.    Case Manger Smith**

Finally, Case Manager Smith is entitled to summary judgment. Mr. Hatton contends she was deliberately indifferent because she did not assign him a bottom bunk pass. *See* Dkt. 85-6 at 70. Mr. Hatton contends that he was transferred into C-Dorm in October 2020 and, on one

occasion, he requested a bottom bunk pass from Case Manager Smith in the hallway. *Id.* at 78. But Case Manager Smith did not have the authority to issue a bottom bunk pass absent an order from the medical staff. Dkt. 81-1 at ¶ 10; *see also* Dkt. 85-6 at 81 – 82 (Mr. Hatton acknowledging that bottom bunk passes come from medical providers). On top of that, Case Manager Smith attested that Mr. Hatton was never assigned to her unit nor was he assigned to her case load. Dkt. 81-1 at ¶ 13. While Case Manager Smith did have the authority to order an emergency bed move, the majority of bed moves come from Unit Team Managers, and Case Manager Smith had no medical training to properly assess whether Mr. Hatton required a bottom bunk pass. *Id.* ¶¶ 7, 13. No rational jury could find that she was deliberately indifferent for failing to put in an emergency bed move for an offender who was not assigned to her case load. Accordingly, summary judgment for Case Manager Smith is appropriate.

## IV.
## Conclusion

For those reasons, Defendants' motions for summary judgment, dkts. [79] and [83] are **granted**. Final judgment shall enter accordingly.

**SO ORDERED**.

Date: 8/31/2022

*Sarah Evans Barker*

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

TIMOTHY N. HATTON
231193
NEW CASTLE - CF
NEW CASTLE CORRECTIONAL FACILITY - Inmate Mail/Parcels
1000 Van Nuys Road
NEW CASTLE, IN 47362

Douglass R. Bitner
Stoll Keenon Ogden PLLC
doug.bitner@skofirm.com

Andrew J. Sickmann
BOSTON BEVER KLINGE CROSS & CHIDESTER
ajsickmann@bbfcslaw.com